[Civ. Nos. 4062, 4063.   Third Appellate District.—May 3, 1930.]

FOSTER W. BYERS, Plaintiff and Appellant, v. E. L. DOHENY, Defendant and Appellant.

Blackstock & Rogers for Plaintiff and Appellant.

Wellborn, Wellborn & Wellborn for Defendant and Appellant.

FINCH, P. J.—The complaint alleges that at all times between July, 1925, and November, 1926, the Crown Oil Company was the owner, subject to a deed of trust, of all the land described in the complaint; that, subject to the same deed of trust, the plaintiff was the owner of an "oil lease upon 40 acres of said property" and an option "for an oil lease upon all of said real property" other than said 40 acres; that prior to any negotiations with the defendant the plaintiff was given judgment against the Crown Oil Company requiring it to execute a lease in accordance with the terms of said option, the judgment setting forth a copy of the lease to be executed; that the judgment had become final and the plaintiff had been put in possession of the property; that steps were being taken to sell the land under the terms of the deed of trust to satisfy the indebtedness secured thereby and the "plaintiff realized that his leasehold interest in all of said property was jeopardized"; that "in order to protect his leasehold rights, said plaintiff began negotiations with the holders of said obligation secured by said trust deed, and endeavored to interest someone to assist him in the purchase of said trust deed or of the said property, and on or about the first day of July, 1926, began negotiations with defendant toward that end; . . . that said defendant by reason of said negotiations became interested in said real property and desired to secure an interest in the same, and so advised plaintiff; that plaintiff thereupon continued negotiations with the holders of the obligation secured by said trust deed, and expended his time and effort and considerable amount of his personal funds in pursuing said negotiations and finally secured the consent of said owners of said obligation to sell all of said property and all of their rights thereunder, for the sum of $100,000."

The foregoing allegations were proved by uncontradicted evidence and the court found them to be true. The allegations of the complaint continue as follows:

"That it was thereupon expressly agreed and understood by and between said plaintiff and said defendant that said property should be acquired by the parties hereto and that

said defendant would pay on account of said purchase, the sum of $75,000 in cash, and that said plaintiff should provide the remaining sum of $25,000 of the purchase price thereof; that it was then and there expressly understood and agreed by and between the plaintiff and the defendant that the interests of the parties in said real property should be held in the following proportions: that defendant should take and have in his name the title to the fee in said real property, and that plaintiff should take and have in his name of and from defendant, a lease of the oil and mineral rights on all of said property for the term, and under the provisions of said leases, which he held upon said property as aforesaid''; that ''pursuant to said understanding and agreement'' the defendant took an assignment of the trust deed and the moneys secured thereby and paid in cash the sum of $75,000 of the purchase price thereof and the plaintiff gave the assignors his promissory note in the sum of $25,000 in payment of the remainder of the purchase price; that thereafter, ''on November 13, 1926, and pursuant to said understanding and agreement, . . . a sale of said real property under said trust deed was had, at which sale, pursuant to said agreement and understanding, said defendant bid in said property, in his own name, and the legal title to said property passed to and became vested in said defendant.'' The prayer is for a decree adjudging that the plaintiff ''is the owner of a leasehold interest in said real property for the time and upon the terms and subject to the provisions as in this complaint set forth, . . . that the defendant convey said leasehold interest to the plaintiff, . . . and for . . . such other relief as shall be proper.''

The answer denies the material allegations of the complaint, ''but alleges that plaintiff, knowing that defendant had some knowledge of the property in question, importuned him to purchase said property, inasmuch as plaintiff represented that he, plaintiff, was about to lose all interest or estate in the same.''

The court found ''that defendant did agree to and with plaintiff that he, said defendant, would give and grant to said plaintiff a lease of the oil and mineral rights on all of said property for the term, on the terms, and with the provisions as alleged in said complaint; that on the trial of said cause said defendant interposed the defense of the

statute of frauds of the state of California to and against said agreement; and the court finds that no note or memorandum of said agreement on the part of defendant was or is in writing subscribed by defendant or by his agent, and that said agreement is for that reason void and unenforceable as against defendant; and that it is not true that defendant holds said or any leasehold interest for plaintiff; but that it is true that plaintiff did contribute and pay of the purchase price of all of said property one-fourth thereof and that defendant now holds an undivided one-fourth interest in and to all of said property in trust for plaintiff."

Judgment was entered in accordance with the findings. The defendant has appealed from the whole of the judgment and the plaintiff has appealed from the part thereof which adjudges that "plaintiff is not entitled to and is not awarded a lease of the oil and mineral rights on the property involved in said action."

The plaintiff testified that he first met the defendant about July 1, 1926; that his purpose in going to the defendant was "to get him to acquire the trust deed, . . . to protect my interests. . . . I told him I wanted some one to acquire the trust deed and take possession either of the land or the trust deed, and hold the fee and get for that a one-sixth royalty, and give me the same lease that was in the decree of the superior court of Ventura county (plaintiff's judgment against the Crown Oil Company). . . . He said he would help; he was sure for $75,000 we could purchase the property or the trust deed, and he informed Mr. Olin Wellborn to take me to his office and have Mr. Wellborn III and I to close the deal, and when ready for the money to come up to his office and he would give Mr. Wellborn his $75,000. . . . Mr. Olin Wellborn III was present at the time this was stated." The plaintiff further testified that, at the time stated, the defendant agreed to give him a lease in accordance with the terms of the decree in his aforesaid action against the Crown Oil Company. The defendant denied that he so agreed to give the plaintiff a lease. He did not testify as to what he did agree to do in consideration of the plaintiff's services and expenditures in connection with the purchase of the property and it is not to be presumed that the parties had no agreement or understanding in that connection. It must be taken as an established fact on this appeal that the

defendant orally agreed to lease the property to the plaintiff on the terms required by the judgment against the Crown Oil Company, but since the lease agreed upon was to run for a longer period than one year, the oral agreement is unenforceable unless the defendant is estopped to invoke the statute of frauds as a defense.

The beneficiaries under the trust deed are referred to by the witnesses and will be referred to herein as "the Crockers." They were represented, in the transactions mentioned herein, by D. J. Murphy and H. J. Finn. At all times after the making of the oral agreement in question the defendant was represented by Olin Wellborn III as his attorney and agent, but not as his attorney-in-fact. The defendant was not personally present at any transaction subsequent to such oral agreement. A purported sale of the property was conducted by the trustees under the deed of trust on July 19, 1926, Finn becoming the purchaser thereof for the Crockers at the price of $80,000. Wellborn was present at the sale as the representative of the defendant and the Petroleum Securities Company, a corporation of which the defendant was president and the capital stock of which was all owned by the defendant and the members of his family. Prior to the sale the defendant gave Wellborn a blank check, signed "Petroleum Securities Co. E. L. Doheny, President," and authorized him to fill in the check for an amount not to exceed $75,000 and to purchase the property in question if it could be had for not more than that sum. After the sale and on the day thereof, the plaintiff and Wellborn endeavored to reach an agreement with Finn and Murphy for the sale of the property by the Crockers to the Petroleum Securities Company. Finn and Murphy would not agree to sell for anything less than $100,000 and Wellborn would not agree to pay more than $75,000, saying that was the limit of the price he was authorized to pay. Finally the plaintiff offered to give his promissory note for $25,000 in payment of the remainder of the price asked by Finn and Murphy and they accepted the offer. Wellborn knew of this arrangement between the plaintiff and Finn and Murphy, but he refused to join in a single set of escrow instructions. He filled in the blank check for $75,000 and placed it in escrow with instruction to deliver it to William H. Crocker upon the delivery of a deed conveying the property to the

Petroleum Securities Company, together with a guarantee of title. The instructions were signed "Petroleum Securities Company, by Olin Wellborn, III." Finn placed in escrow with the same depositary various instruments purporting to convey title to the Petroleum Securities Company, with direction to deliver them to the grantee upon payment of $75,000 and delivery of the plaintiff's promissory note in the sum of $25,000. The plaintiff delivered in escrow his promissory note for $25,000 with instruction "to hand said note to William H. Crocker upon the consummation of this escrow between Howard Finn and Petroleum Securities Company."

The plaintiff testified that he did not remember that Wellborn "stated to Mr. Finn . . . that he had no authority to pay over $75,000." Finn and Murphy, who were witnesses for the plaintiff, both testified that Wellborn so stated during the negotiations on July 19 after the trustees' sale. On July 20th the plaintiff signed a letter, addressed to the defendant, in which the following appears:

"I fully realize that your understanding of the matter was that the full purchase price of the property was $75,000.00 and no more, and that you would not have purchased the same at any price in excess of such $75,000.00.

"Notwithstanding this, I was so anxious to cause the prop-. erty to be taken out of the hands of the beneficiary who had caused the sale of the same under his trust deed that I permitted his representative to induce me to sign a promissory note for $25,000.00 payable to Howard Finn on or before two years from the date thereof, and place said note in escrow with the Bank of Italy at Ventura in the same escrow in which you placed your $75,000.00 for the purchase of said property.

"This is to assure you that I had no ulterior motive in so signing the said note and placing it in escrow, and that said note was in no way to constitute a part of the purchase price of said property, nor was it given with a view to making any other claim of any kind as to ownership or interest past, present or future in the property by myself.

"In other words, the aforesaid note was executed entirely as a private transaction between Mr. Finn and myself as aforesaid and had nothing to do with the purchase price of the property which, as far as you are concerned, if the aforesaid escrow be completed, will be purchased by you out-

right at and for the sum of $75,000.00, which was the full and complete purchase price thereof notwithstanding the making of said note by myself; and upon the completion of the aforesaid escrow you will acquire the full and unencumbered legal and equitable title to the property hereinabove described, clear of all claims of interest on my part of any nature or character whatsoever.''

The plaintiff testified that he signed the letter at Wellborn's request, but that he did not read it. In relation to the letter he testified: ''Mr. Wellborn stated to me inasmuch as I was only getting the lease and Mr. Doheny was getting the fee to the property that he had prepared a piece of paper, prepared an instrument to the effect, would I mind signing it, and I looked up and asked Mr. Wellborn, he was still holding the paper, and I says, 'Did you write it,' and he handed it out and I signed it. I never looked at it.''

Wellborn gave the following testimony: ''Q. You knew that Mr. Byers had put up the $25,000 note there, didn't you? A. Yes, sir. Q. You knew for what purpose it was put up, didn't you? A. I thought I did. Q. You read his escrow instructions? . . . A. I did read Byers' escrow instructions but I had nothing to do with it. Q. What did you think the note was put up for? A. I thought the note was put up, a separate transaction between Mr. Byers and Mr. Finn because Mr. Byers knew if the property stayed in Mr. Crocker's hands that he was out there and he wanted it in Mr. Doheny's hands and over my objection and statement he was so anxious to get out of Mr. Crocker's hands and into Mr. Doheny's hands, he gave the note, a separate transaction. . . . Q. And what was your idea that he was giving this $25,000 for? A. I did not know. . . . I noticed it was put in that escrow under the statement I had from Byers and he had made, which he subsequently permitted to go in writing. . . . Q. And you knew one of the terms of the escrow was that the note was to go to the Crockers in case the sale took place? . . . A. Yes sir.''

The foregoing evidence relating to the deposit in escrow of the promissory note for $25,000 points unerringly to the conclusion that the plaintiff did not believe or understand that by contributing that sum to the purchase price of the property he was acquiring a one-fourth interest therein. Such evidence points with equal certainty to the

conclusion that the plaintiff's purpose in giving the note was to bring about the sale of the property to the defendant or the Petroleum Securities Company in order that the defendant might be able to perform his agreement to lease the land to the plaintiff, and that Wellborn had full knowledge of such purpose. It is unbelievable that the plaintiff contributed one-fourth of the purchase price of the property without any agreement that he was to receive anything in consideration thereof or that Wellborn permitted a stranger to the transaction to donate to his wealthy principal one-fourth of such purchase price.

■ Doubts having arisen as to the validity of the sale of July 19, 1926, the agreement arrived at on that day was abandoned and subsequently the Crockers deposited in escrow the trust deed and the promissory notes secured thereby, all duly assigned to the defendant, and other papers necessary to complete the transfer, with instructions to deliver them to the defendant "upon forwarding to us the sum of $75,000," and a promissory note "to be dated September 30, 1926, payable to Howard Finn, in the sum of $25,000, . . . signed by Foster W. Byers." The plaintiff and the defendant severally complied with the terms of the escrow and the trust deed and the notes secured by it were delivered to the defendant. He thereafter caused the land to be sold under the terms of the trust deed and he became the purchaser thereof at the trustees' sale. The plaintiff executed a quitclaim deed of the property to the defendant, containing the following:

"It is the intention and purpose of this deed to convey to grantee above all right, title and interest of, in and to the above described property which the grantor Foster W. Byers may have acquired by virtue of judgment and decree in cause No. 10329 filed . . . on the 28th day of June, 1926, and the writ of possession thereunder, in which cause Foster W. Byers was plaintiff; and Crown Oil Company, a corporation, was defendant."

Since plaintiff's rights under the judgment mentioned were subordinate to the trust deed, it does not appear that the quitclaim deed conveyed anything to the defendant. An officer of the abstract company which issued the certificate of title to the defendant testified that "the suggestion as to the securing of that quitclaim deed" came from him; that

to enable the abstract company to issue a certificate showing title in the defendant the witness "demanded a quitclaim deed of and from Mr. Byers to Mr. Doheny." It appears from this testimony and from the terms of the deed itself that no importance is to be attached to the execution thereof.

The plaintiff has been in possession of the property at all times since June 28, 1926. There are producing oil-wells on the land and the plaintiff has kept a man employed during the time mentioned "to pump the wells to keep the lease and ship the oil." It appears from the evidence that it has a damaging effect upon a producing oil-well to shut it down.

To permit the defendant, under the circumstances stated, to invoke the statute of frauds as a defense would be to make the statute an instrument of fraud. On July 19, 1926, and at all times thereafter, Wellborn knew that the plaintiff was paying one-fourth of the purchase price of the property in reliance upon the defendant's oral agreement to execute the alleged lease. The defendant was chargeable with the knowledge of his agent in relation to the transaction. "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." (Civ. Code, sec. 2332.) "He who can and does not forbid that which was done on his behalf, is deemed to have bidden it." (Civ. Code, sec. 3519.) Specific performance of a verbal agreement to execute a lease has been decreed in this state in a case where the landlord was estopped to invoke the statute of frauds. (*Clark* v. *Clark*, 49 Cal. 586.) It is unnecessary, however, to decide whether the facts proved in this case constitute an estoppel.

Had the plaintiff paid one-fourth of the purchase price without any agreement or understanding as to the interest he would thereby acquire in the property, he would have been entitled, under the provisions of section 853 of the Civil Code, to the judgment which was entered herein, but the agreement between the parties was to the effect that the plaintiff was to acquire only a leasehold interest in the property. It may be inferred from the vigor with which this case is prosecuted and defended that such leasehold interest is of considerable value. The effect of the lease, therefore, is to make the land less valuable than it would be

if freed from the lease. This probably accounts for the fact that the defendant, after having agreed to continue the lease in force, was unwilling to pay in excess of $75,000 for the property and also for the plaintiff's willingness to pay $25,000 to consummate the transaction. If the parties had expressly agreed that the plaintiff would pay $25,000 for the leasehold interest and the defendant $75,000 for the land subject to the lease, the title to be taken in the defendant's name, then, upon the consummation of the transfer, the defendant would undoubtedly hold title to the leasehold interest in trust for the plaintiff. This is in effect what the parties actually did, and the conclusion follows that the defendant holds title to the leasehold interest in trust for the plaintiff. "It is now a generally accepted rule that a resulting trust may arise in favor of one who furnishes a part of the purchase money for land where the title is taken in another, though there is a diversity of opinion as to whether there must be a distinct understanding that the payment is for a definite interest in the land, or whether the fact of furnishing the money without more will raise a resulting trust. Many courts take the view that the money must have been paid for a specific undivided share, as a half, quarter, etc., or for a particular interest, as a life estate, remainder, etc." (26 R. C. L. 1224; *Breitenbucher* v. *Oppenheim,* 160 Cal. 98 [116 Pac. 55].) In this case the payment made by the plaintiff was for a "particular interest," the leasehold interest in the land. "The fact that an oral agreement was made does not preclude the plaintiff from relying on the trust which arises by implication of law from the acts done pursuant to such agreement." (25 Cal. Jur. 179; *Breitenbucher* v. *Oppenheim, supra; Pavlovich* v. *Pavlovich,* 22 Cal. App. 500 [135 Pac. 303].) ■ The plea of the statute of frauds cannot be set up as a bar to relief in cases of resulting trusts. (*Pavlovich* v. *Pavlovich, supra.*)

From what has been said it appears that there is merit in both appeals and that the entire judgment must be reversed. While there is ample evidence to support a judgment for the plaintiff, the findings are not sufficient to warrant this court in directing the entry of such a judgment.

The judgment is reversed.

Plummer, J., and Thompson (R. L.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal June 2, 1930, and the following opinion then rendered thereon:

THE COURT.—The defendant has filed a petition for a rehearing.

In the opinion heretofore filed it is said: "The payment made by the plaintiff was for a particular interest, the leasehold interest in the land." By the term "leasehold interest" it was not intended to refer to the leasehold interest held by the plaintiff prior to the sale of the land under the trust deed but to a like interest acquired by the purchase of the land at such sale.

In his petition the defendant quotes from the opinion that "the plaintiff further testified that . . . the defendant agreed to give him a lease in accordance with the terms of the decree in his aforesaid action against the Crown Oil Company," and then says: "We have again read very carefully the entire transcript of the evidence in this case . . . and we have been unable to find any such testimony by the plaintiff." It is not deemed necessary to lengthen this opinion by quoting from the testimony of the plaintiff, but, for the convenience of counsel for the defendant, it may be said that folios 193, 198, 390, 392, 393, 394, 395, 396, 398, 399 and 416 of the supplement to his opening brief amply support the statement quoted from the opinion.

The case has been discussed on the theory of the enforcement of a resulting trust rather than the specific performance of an oral agreement.

The petition is denied.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 30, 1930.